UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18cr 60228- Bloom/Valle

18 U.S.C. § 371

**UNITED STATES OF AMERICA**

v.

**BASLER KANTONALBANK,**

    **Defendant.**

_____/

**INFORMATION**

The United States Attorney charges that:

**Introduction**

At all times relevant to this Information:

1. Defendant **BASLER KANTONALBANK** (**"BKB** or the **Bank"**) was a public-law institution incorporated by the Parliament of the Basel City Canton. BKB had its headquarters in Basel, Switzerland. From 1997 to 2014, BKB had a private-banking branch that was located in Zurich, Switzerland.

2. BKB provided a variety of banking and other financial services to customers in the Canton of Basel, as well as outside Switzerland, including providing private-banking and asset-management services to U.S. citizens and residents, some of whom lived in the Southern District of Florida. BKB also acted as a custodian of assets that were managed by third-party investment advisors and external asset managers ("EAMs").

3. United States citizens, resident aliens, and legal permanent residents ("U.S. persons") were obligated to report all income earned worldwide, including from foreign bank

1

accounts, on their tax returns and to pay the taxes due on that income. U.S. persons were also obligated to report to the Internal Revenue Service ("IRS"), on Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether they had a financial interest in, or signature or other authority over, a financial account in a foreign country in a particular year and to identify the country where the account was maintained.

4. In addition, U.S. persons who had a financial interest in, or signature or other authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file a Report of Foreign Bank and Financial Accounts Form TD 90-22.1 (since changed to FinCEN Form 114), ("FBAR") with the Department of the Treasury.

5. An "undeclared account" was a financial account beneficially owned by a U.S. person and maintained in a foreign country that the U.S. person had not timely reported to the United States on a tax return and FBAR.

## COUNT 1
## CONSPIRACY 18 U.S.C. § 371

6. The factual allegations contained in Paragraphs 1 through 5 of this Information are realleged and incorporated by reference as if copied verbatim.

7. From at least 2002 through 2012, in the Southern District of Florida and elsewhere, the defendant,

**BASLER KANTONALBANK,**

did knowingly and willfully combine, conspire, confederate and agree with certain U.S. persons, EAMs, and employees of BKB, to defraud the United States with respect to taxes and to commit

offenses against the United States, namely, violations of Title 26, United States Code, Sections 7201 and 7206(1).

8.      It was an object of the conspiracy that BKB and its co-conspirators would conceal the offshore assets and income of U.S. persons who maintained financial accounts at BKB from the IRS, evade the U.S. persons' tax obligations, and file false federal tax returns with the IRS.

## Overview of the Conspiracy

9.      From at least 2002 through 2012, BKB assisted certain U.S. persons in concealing their offshore assets and income from U.S. taxing authorities, evading their U.S. tax obligations, and filing false federal tax returns with the IRS. By 2010, when the Bank's U.S. related business was at its peak, the Bank held a total of approximately 1,144 accounts on behalf of U.S. customers with an aggregate value of approximately $813.2 million. Many (but not all) of these accounts were undeclared. BKB provided a number of traditional Swiss banking services that could assist and did assist its U.S. clients in concealing their accounts from the U.S. government, including the use of code names for accounts, prepaid debit cards, and hold-mail services in which the Bank would not send any account documents to the account holders. In some instances, bankers at BKB and EAMs working with BKB would emphasize to clients and prospective clients that Swiss bank secrecy could conceal their accounts from U.S. taxing authorities.

10.     Employees of the Bank met directly with some U.S. clients, but the clients primarily interacted with BKB through EAMs with whom BKB had a contractual relationship. Among these EAMs was Martin Lack. In or around 2003, BKB entered into a relationship with Lack, who had recently left Swiss bank UBS AG. Lack brought to BKB over twenty U.S. clients with undeclared accounts. With the knowledge and encouragement of the leadership of BKB's

Zurich branch, Lack traveled to the United States to meet with U.S. clients with undeclared accounts and, over the years, brought additional U.S. persons seeking undeclared accounts to the Bank to become clients.

11.  In March 2008, the Bank became aware that UBS was considering closing its cross-border business of servicing U.S. domiciled persons. Soon after, in May 2008, it became public that UBS's U.S. cross-border business was under criminal investigation by U.S. authorities. The Bank's Zurich branch saw this as a business opportunity and seized it, signing up additional EAMs and offering usual finders' fees to bring in clients leaving UBS. In some instances, the Bank and the EAMs promoted BKB as a safe haven for those leaving other banks because it lacked a U.S. presence and therefore supposedly would not be subject to a U.S. criminal investigation. Between July 2008 and March 2009, the Bank opened 398 new accounts for U.S. persons, resulting in approximately $441.6 million in new assets for the Bank.

### Manner and Means of the Conspiracy

12.  Among the manner and means by which BKB and its co-conspirators carried out the conspiracy were the following:

   a. BKB opened accounts for U.S. persons that the clients did not report to the United States on either Forms 1040, Schedule B, or on FBARs, and for which the U.S. persons did not report or pay taxes on account earnings to the United States. The materially false Forms 1040 that clients filed were often electronically transmitted to the IRS through the use of interstate wire communications. Funds were often transferred to or from these accounts by means of wire transfers in foreign commerce.

   b. BKB entered into contracts with EAMs and allowed these EAMs to manage undeclared accounts for U.S. persons at the Bank.

c. BKB bankers and co-conspirator EAMs assured certain clients that Swiss bank secrecy would conceal their assets and income from being disclosed to U.S. taxing authorities.

d. BKB provided hold-mail services, under which account statements and other documents associated with the client's account would not be sent to the customer's address, if any, in the United States, which might reveal a connection between the client and the Bank.

e. BKB provided certain clients with "assumed name" and "numbered" accounts that provided an extra level of concealment. The accountholder's name would not appear on any correspondence, statements, or similar documents.

f. BKB allowed U.S. persons to maintain accounts at the Bank through nominee corporations or other entities that were established in various tax-haven jurisdictions, including the British Virgin Islands, Liechtenstein, and Panama. Many of these entities were established with the assistance of EAMs and the Bank knew that the accounts were beneficially owned by U.S. persons.

g. Beginning in 2008, after the criminal investigation of UBS became public, the Bank signed contracts with additional EAMs as part of an effort to attract clients leaving UBS and other Swiss banks.

h. Beginning in 2008, after the criminal investigation of UBS became public, BKB bankers and its co-conspirator EAMs emphasized the Bank's lack of a U.S. physical presence as supposedly meaning that the Bank could not be subject to a U.S. criminal investigation.

## Overt Acts

13. In furtherance of the conspiracy and to effect the illegal objects thereof, BKB and other co-conspirators, committed the following overt acts, among others, in the Southern District of Florida and elsewhere:

   a. In or around 2003, the Bank entered into an agreement with Lack, pursuant to which Lack brought U.S. clients with undeclared accounts to BKB.

   b. On or about December 13, 2004, Lack met in Miami, Florida with two of his clients with accounts at BKB and accepted a total of approximately $160,000 in cash from those clients as deposits into their undeclared accounts at BKB.

   c. On or about September 20, 2005, Lack met in Miami, Florida with three of his clients with accounts at BKB and gave them a total of approximately $45,000 in cash as withdrawals from their respective undeclared accounts at BKB.

   d. In or after March 2008, BKB employees, including the leadership of the Zurich branch, decided to pursue clients leaving UBS as a business opportunity and authorized usual finder's fees and signed up new EAMs in an effort to attract new clients.

   e. On various dates in or after March 2008, BKB opened new undeclared accounts for U.S. persons leaving other Swiss banks, including, for example, an account for a client who was told by UBS his account needed to be closed because of U.S. government action. In or around 2008, the client, at the advice of UBS, went to BKB and met with a BKB banker, who encouraged him to transfer his account to

BKB because it still had Swiss bank secrecy and was "safe" and "independent" from the United States. The client agreed and transferred his undeclared account from UBS to BKB.

All in violation of Title 18, United States Code, Section 371.

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

THOMAS P. LANIGAN
ASSISTANT UNITED STATES ATTORNEY

RICHARD E. ZUCKERMAN
PRINCIPAL DEPUTY ASSISTANT ATTORNEY
GENERAL TAX DIVISION

MARK F. DALY
SENIOR LITIGATION COUNSEL
JASON H. POOLE
TRIAL ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO. 18cr60228-Blum/Valle

vs.

BASLER KANTONALBANK,

Defendant.

_____/

**CERTIFICATE OF TRIAL ATTORNEY***

**Case Information:**

**Court Division**: (Select One)

Miami _____   Key West _____
FTL   X   WPB _____   FTP _____

New Defendant(s)          Yes _____   X   No
Number of New Defendants _____
Total number of counts _____

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:   (Yes or No)   No
   List language and/or dialect _____

4. This case will take:   0   for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                          (Check only one)
   I      0 to 5 days    _____              Petty    _____
   II     6 to 10 days   _____              Minor    _____
   III    11 to 20 days  _____              Misdem.  _____
   IV     21 to 60 days  _____              Felony   x
   V      61 days and over _____

6. Has this case been previously filed in this District Court?  (Yes or No)   No
   If yes:
   Judge: _____   Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No)   No
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____ District of _____
   Is this a potential death penalty case? (Yes or No)   No   x

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?   _____ Yes   X   No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?   _____ Yes   X   No

THOMAS P. LANIGAN
ASSISTANT UNITED STATES ATTORNEY
Court ID No. A5500033

*Penalty Sheet(s) attached                                              REV 4/8/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name: **BASLER KANTONALBANK**

Case No:_____

Count #: 1

Conspiracy to defraud the United States and an agency thereof, the Internal Revenue Service in violation of

Title 18, United States Code, Section 371

* Max. Penalty: Five (5) years` imprisonment; $250,000 fine

Count #:


* Max. Penalty:


*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.