# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-CR-60228-Bloom

UNITED STATES OF AMERICA

v.

BASLER KANTONALBANK,

      Defendant.

_____/

## JOINT MOTION FOR APPROVAL OF THE DEFERRED PROSECUTION AGREEMENT AND EXCLUSION OF TIME UNDER THE SPEEDY TRIAL ACT

The United States of America, by and through undersigned counsel, and defendant Basler Kantonalbank, by its attorneys, hereby move this Court for the entry of an Order approving the attached Deferred Prosecution Agreement and for the exclusion of time within which any trial must be commenced upon the charge contained in the Information filed against Basler Kantonalbank, pursuant to Title 18, United States Code, Section 3161(h)(2) of the Speedy Trial Act.

1.  On August 28, 2018, the United States and Basler Kantonalbank entered into a written Deferred Prosecution Agreement ("the Agreement"), a true, correct, and complete copy of which is attached hereto and incorporated by reference herein as Exhibit 1. The purpose of the Agreement is to allow Basler Kantonalbank to demonstrate its good conduct.

2.  In paragraph 1 of the Agreement, Basler Kantonalbank agreed to consent to the filing of an Information in this Court charging it with conspiring to defraud the United States, in violation of Title 18, United States Code, Section 371. A copy of the Waiver of Indictment is attached hereto as Exhibit 2.

1

3.  On August 22, 2018, the United States filed with the clerk of this Court an Information charging Basler Kantonalbank with conspiring to defraud the United States and to commit violations of 26 U.S.C. §§ 7206(1) and 7201. As described in more detail in the Agreement, Basler Kantonalbank has agreed: (a) to acknowledge responsibility for its actions; (b) cooperate with the United States; and (c) pay $60,400,000.

4.  The United States respectfully recommends to this Court, pursuant to Title 18, United States Code, Section 3161(h)(2), that it approve the Agreement and that prosecution of Basler Kantonalbank on the Information be deferred for a period of the longer of three years from the date of the signing of the Agreement, but not longer than four (4) years, as set forth in paragraphs 19 and 21 of the Agreement ("Duration of the Agreement").

5.  Basler Kantonalbank hereby joins in and consents to this motion and does not oppose a continuance of all further proceedings, including initial appearance and trial, for the Duration of the Agreement, for speedy trial exclusion of all time covered by such a continuance, and for approval by the Court of this deferred prosecution.

6.  Basler Kantonalbank hereby agrees to waive and does hereby expressly waive any and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of Florida for the Duration of the Agreement.

7.  The United States has agreed that if Basler Kantonalbank is in full compliance with all of its obligations under the Agreement, the United States, within thirty (30) days or earlier of the expiration of the time period set forth in paragraph 19 of the Agreement,

will move this Court for dismissal with prejudice of the Information filed against Basler Kantonalbank.

WHEREFORE, the United States and Basler Kantonalbank respectfully request that this Honorable Court enter an Order approving the Agreement and continuing all further proceedings, including initial appearance and trial, for the Duration of the Agreement, pursuant to Title 18, United States Code, Section 3161(h)(2) of the Speedy Trial Act. A proposed Order is attached for the convenience of the Court.

Respectfully submitted,

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

By: _____
THOMAS P. LANIGAN
ASSISTANT UNITED STATES ATTORNEY
Court ID No. A5500033
500 East Broward Blvd., 7th Floor
Ft. Lauderdale, FL 33394
Tel: (954) 660-5790
Fax: (954) 356-7336
Tom.Lanigan@usdoj.gov

_____
RICHARD E. ZUCKERMAN
PRINCIPAL DEPUTY ASSISTANT
ATTORNEY GENERAL, TAX DIVISION

_____
MARK F. DALY
SENIOR LITIGATION COUNSEL
JASON H. POOLE
TRIAL ATTORNEY
601 D Street NW – Room 7334
Washington, DC 20004
Telephone: (202) 616-2245
Facsimile: (202) 616-1786

3

BASLER KANTONALBANK
DEFENDANT

By: _____
KEITH KRAKAUR, ESQ.
CHRISTOPHER GUNTHER, ESQ.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
COUNSEL TO DEFENDANT

By: _____
LOCAL COUNSEL
COUNSEL TO DEFENDANT

Daniel Rashbaum

4

# EXHIBIT 1

**U.S. Department of Justice**

*Tax Division*

August 28, 2018

Keith D. Krakaur
Christopher J. Gunther
Skadden, Arps, Slate, Meagher & Flom LLP
40 Bank St, Canary Wharf
London, UK
E14 5DS

**Re:  Basler Kantonalbank – Deferred Prosecution Agreement**

Dear Messrs. Krakaur and Gunther:

The Tax Division of the United States Department of Justice and the United States Attorney's Office for the Southern District of Florida (collectively, the "Office") and defendant Basler Kantonalbank ("BKB" or the "Bank"), under authority granted by its Board of Directors in the form of a Board Resolution (a copy of which is attached hereto as Exhibit A), hereby enter into this Deferred Prosecution Agreement (the "Agreement").

This Agreement shall take effect upon its execution by both parties.

### The Criminal Information

1.      BKB waives indictment and consents to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of Florida (the "Court"), charging BKB with conspiring with others, including U.S. persons, in violation of Title 18, United States Code, Section 371, to (1) defraud the United States and an agency thereof, to wit, the United States Internal Revenue Service (the "IRS"), (2) to file false federal income tax returns in violation of Title 26, United States Code, Section 7206(1), and (3) to evade federal income taxes in violation of Title 26, United States Code, Section 7201.  A copy of the Information is attached hereto as Exhibit B.

### Acceptance of Responsibility

2.      BKB admits and stipulates that the facts set forth in the Statement of Facts, attached hereto as Exhibit C and incorporated herein, are true and accurate.  In sum, BKB admits that it is responsible under United States law for the acts of its officers, directors, employees, and agents and that the allegations of federal criminal violations charged in the Information and set forth in the Statement of Facts as a result of those acts are true and accurate.

3.      BKB further admits and stipulates that the acts labeled "overt acts" and set forth in Paragraph 13 of the Information in fact took place.

Basler Kantonalbank
Deferred Prosecution Agreement
Page 2

## Restitution, Forfeiture and Penalty Obligations

4.      As a result of the conduct described in the Information and the Statement of Facts, BKB agrees to make payments in total of $60.4 million to the United States. Specifically, BKB agrees to (1) make a payment of restitution in the amount of $17,200,000 (the "Tax Restitution Amount"), (2) forfeit to the United States $29,700,000 million (the "Forfeiture Amount"), and (3) pay a penalty of $13,500,000 (the "Penalty Amount") to the U.S. Department of Justice (the "Department"), as set forth below.

5.      In regard to the Tax Restitution Amount, BKB admits that the Tax Restitution Amount represents the approximate unpaid pecuniary loss to the United States as a result of the conduct described in the Statement of Facts. The Tax Restitution Amount shall not be further reduced by payments that have been made or may be made to the United States by U.S. taxpayers through the Offshore Voluntary Disclosure Initiative and similar programs (collectively, "OVDI") before or after the date of this Agreement. BKB agrees to pay the Tax Restitution Amount to the IRS by wire transfer within seven (7) days of the date of the execution of this Agreement. If BKB fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 22 and 23, below.

6.      In regard to the Forfeiture Amount, BKB agrees, pursuant to Title 18, United States Code, Section 981(a)(1)(C) that it will forfeit to the United States the Forfeiture Amount.

7.      The Forfeiture Amount of $29,700,000 represents gross fees paid to BKB by U.S. taxpayers with undeclared accounts at BKB from January 1, 2002, through approximately December 31, 2012.

8.      The Forfeiture Amount shall be sent by wire transfer to a seized asset deposit account maintained by the United States Department of the Treasury within seven (7) days of the execution of this Agreement. If BKB fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 22 and 23, below.

9.      BKB agrees this Agreement, the Information, and the Statement of Facts may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint"), a copy of which is attached hereto as Exhibit D, that will be filed against the Forfeiture Amount. By this Agreement, BKB expressly waives service of that Civil Forfeiture Complaint and agrees that a Final Order of Forfeiture may be entered against the Forfeiture Amount. BKB also agrees that the facts contained in the Information and Statement of Facts are sufficient to establish that the Forfeiture Amount is subject to civil forfeiture to the United States.

10.     The Office and BKB agree that, consistent with the factors set forth in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3572(a), and in light of the Forfeiture Amount and the Tax Restitution

Basler Kantonalbank
Deferred Prosecution Agreement
Page 3

Amount, the Penalty Amount of $13,500,000 is an appropriate penalty given the facts and circumstances in this case. BKB agrees to pay the Penalty Amount as directed by the Office within seven (7) business days of the date of the execution of this Agreement. The Penalty Amount represents a reduction of approximately 55% from the low end of the fine range that the parties agree would be applicable under the United States Sentencing Guidelines if BKB had been convicted and sentenced for its criminal conduct. The Office and BKB agree that the Penalty Amount is appropriate given the facts and circumstances of this case, including the nature and seriousness of BKB's conduct as set forth in the Statement of Facts, and also, in mitigation of a higher penalty, among other things: (1) BKB's thorough internal investigation and concomitant efforts to provide extensive information and materials, consistent with applicable laws and regulations, derived from that investigation to U.S. authorities; and (2) BKB's waiver of any potential defense of foreign sovereign immunity. The Penalty Amount is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Office that the Penalty Amount is the maximum penalty that may be imposed in any future prosecution, and the Office is not precluded from arguing in any future prosecution that the Court should impose a higher penalty.

11.     Upon payment of the Forfeiture Amount, BKB shall release any and all claims it may have to such funds and execute such documents as necessary to accomplish the forfeiture of the funds. BKB agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Forfeiture Amount or the payment of the Penalty Amount and will not assist a third party in asserting any claim to the Forfeiture Amount or the Penalty Amount.

12.     BKB agrees that the Tax Restitution Amount, the Forfeiture Amount and the Penalty Amount shall be treated as non-tax-deductible amounts paid to the United States government for all tax purposes under United States law. BKB agrees that it will not claim, assert, or apply for, either directly or indirectly, a tax deduction, tax credit, or any other offset with regard to any United States federal, state, or local tax, for any portion of the $60.4 million that BKB has agreed to pay to the United States pursuant to this Agreement.

## Obligations to Cooperate

13.     BKB agrees, subject to applicable laws and regulations, to cooperate fully with the Department and the IRS, and any other U.S. governmental agency designated by the Office regarding any matter relating to the Department's investigation about which BKB has information or knowledge.

14.     It is understood that during the term of this agreement BKB shall, subject to applicable laws and regulations, (a) truthfully and completely disclose all information with respect to the activities of BKB, its officers and employees, and others concerning all such matters about which this Office inquires related to this Office's investigation, which information can be used for any purpose, except as limited by this Agreement or by applicable law; (b) cooperate fully with the Department, the IRS, and any other law enforcement agency so designated by this Office; (c) consent to the production to the Department of any document, record, or other tangible evidence; (d) specifically provide, upon request, all items, assistance,

Basler Kantonalbank
Deferred Prosecution Agreement
Page 4

information and documents required to be produced by Swiss banks participating in the Program for Non-Prosecution Agreements or Non-Target Letters for Swiss Banks (the "Program") as set forth specifically in Parts II.D.1,2 and 4 and Part II.F of the Program; (e) with respect to transaction information pursuant to Part II.D.2.b.vi of the Program shall additionally produce such information, as soon as practicable, for all accounts closed in the period from January 1, 2009 through December 31, 2017; (f) undertake the retention of records as set forth in Parts II.D.5 and II.E of the Program; (g) implement the closure of recalcitrant accounts and related procedures, to the extent that it has not already done so, as set forth in Part II.G of the Program; (h) shall, at the Department's request, use its best efforts to secure the attendance and truthful statements or testimony of any officer, agent, employee, or former officer, agent or employee, at any meeting or interview or before the grand jury or at any trial or other court proceeding, to the extent permitted by applicable law; and (i) shall commit no violations of the federal criminal laws of the United States.

15.     Under the terms of this Agreement, BKB shall truthfully and completely disclose, and continue to disclose during the term of this Agreement, consistent with applicable law and regulations, all material information described in Part II.D.1 of the Swiss Bank Program with respect to U.S. Related Accounts held by BKB from 2002 through 2012 (as those terms are defined in the Program) that is not protected by a valid claim of privilege or work product with respect to the activities of BKB and its officers, directors, employees, agents, consultants, and others, which information can be used for any purpose, except as otherwise limited in this Agreement. Subject to applicable laws and regulations, BKB shall disclose to the Tax Division that it has discovered new material information required to be disclosed under this Agreement, including pursuant to this paragraph and paragraph 14(d) and(e), within thirty days of discovery and provide the material information required to be disclosed pursuant to this Agreement, including information as described in Part II.D.1 of the Program and information pursuant to paragraph 14(d) and (e) of this Agreement, within ninety days of discovery. All other terms of this Agreement shall apply with respect to any newly disclosed account.

16.     It is further understood that BKB will bring to this Office's attention (a) all criminal conduct by, and criminal investigations of, BKB or its employees related to any violations of the federal laws of the United States that come to the attention of BKB, and (b) any administrative or regulatory proceeding or civil action brought or investigation conducted by any U.S. governmental authority that alleges fraud by BKB or any other violations of the federal laws of the United States in the operation or management of BKB's business.

Basler Kantonalbank
Deferred Prosecution Agreement
Page 5

## **Deferral of Prosecution and Duration of the Agreement**

17.    The actions BKB has taken to date demonstrate acceptance and acknowledgment of responsibility for its conduct, including, among other things:

- Conducting a thorough internal investigation and providing the Office with the broadest scope of information permissible under Swiss law and disclosing facts, including unfavorable ones, discovered during the course of that internal investigation;

- Implementing remedial measures as described in Section IV of the Statement of Facts;

- Advocating in favor of a decision provided by the Swiss Federal Council in April 2012 to allow banks under investigation by the Department to legally produce employee and third-party information to the Department and subsequently producing such information almost immediately upon issuance of that decision; and

- Conducting extensive outreach to former U.S. customers in order to encourage their participation in IRS-sponsored voluntary disclosure programs.

18.    BKB has also made a commitment to: (a) accept and acknowledge responsibility for its conduct, as described in the Statement of Facts and the Information; (b) cooperate with the Department and the IRS; (c) make the payment specified in this Agreement; (d) comply with the federal criminal laws of the United States (as provided herein in Paragraph 14); and (e) otherwise comply with all of the terms of this Agreement. In consideration of the foregoing, the Office shall recommend to the Court that prosecution of BKB on the Information be deferred for three years from the date of the signing of this Agreement. BKB shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of Florida for the period during which this Agreement is in effect.

19.    BKB agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for three years from the date of the Court's acceptance of this Agreement, unless otherwise extended pursuant to Paragraph 21 below (the "Deferral Period"). BKB's obligation to cooperate is not intended to apply in the event that a prosecution against BKB by this Office is pursued and not deferred.

20.    The Office agrees that if BKB is in compliance with all of its obligations under this Agreement, the Office will, at the expiration of the Deferral Period (including any extensions thereof), seek dismissal with prejudice of the Information filed against BKB pursuant to this Agreement. Except in the event of a violation by BKB of any term of this Agreement or as otherwise provided in Paragraph 22, the Office will bring no additional charges or other civil

Basler Kantonalbank
Deferred Prosecution Agreement
Page 6

action against BKB relating to its conduct as described in the Statement of Facts. This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than BKB and its affiliated entities. BKB and the Office understand that the Agreement to defer prosecution of BKB must be approved by the Court, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to approve the Agreement to defer prosecution for any reason: (a) both the Office and BKB are released from any obligation imposed upon them by this Agreement; (b) this Agreement shall be null and void, except for the tolling provision set forth in Paragraph 22, below; and (c) if they have already been transferred to the United States, the Tax Restitution Amount, Forfeiture Amount and Penalty Amount shall be returned to BKB.

21.    BKB agrees that, in the event that the Office determines during the Deferral Period described in paragraph 19 above (or any extensions thereof) that BKB has violated any provision of this Agreement, an extension of the period of the Deferral Period may be imposed in the sole discretion of the Office, up to an additional year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four years.

## Additional Provisions

22.    It is understood that should the Office in its sole discretion determine that BKB: (a) has knowingly given materially false, incomplete or misleading information either during the term of this Agreement or in connection with the Office's investigation of the conduct described in the Information or Statement of Facts; (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement; or (c) otherwise violated any provision of this Agreement, BKB shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation, or suit for any civil cause of action, of which the Office has knowledge, including but not limited to a prosecution or civil action based on the Information, the Statement of Facts, the conduct described therein, or perjury and obstruction of justice. Any such prosecution or civil action may be premised on any information provided by or on behalf of BKB to the Department or the IRS at any time. In any prosecution or civil action based on the Information, the Statement of Facts, or the conduct described therein, it is understood that: (a) no charge would be time-barred provided that such prosecution is brought within the applicable statute of limitations period (subject to any prior tolling agreements between the Office and BKB), and excluding the period from the execution of this Agreement until its termination; and (b) BKB agrees to toll, and exclude from any calculation of time, the running of the statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to Paragraph 21 above. By this Agreement, BKB expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing, voluntary, and in express reliance on the advice of BKB's counsel.

Basler Kantonalbank
Deferred Prosecution Agreement
Page 7

23. It is further agreed that in the event that the Office, in its sole discretion, determines that BKB has violated any provision of this Agreement in a material respect, including by failure to meet its obligations under this Agreement: (a) all statements made by or on behalf of BKB to the Office, the Department, or the IRS, including but not limited to the Statement of Facts, or any testimony given by BKB or by any agent of BKB before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Office against BKB; and (b) BKB shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of BKB before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence. It is the intent of this Agreement to waive any and all rights in the foregoing respects.

24. BKB, having admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any public statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement. Consistent with this provision, BKB may raise defenses and/or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not contradict the Statement of Facts or such representations. Any such contradictory statement by BKB, its present or future attorneys, agents, or employees shall constitute a violation of this Agreement and BKB thereafter shall be subject to prosecution as specified in paragraphs 22 and 23, above, or the deferral-of-prosecution period shall be extended pursuant to paragraph 21, above. The decision as to whether any such contradictory statement will be imputed to BKB for the purpose of determining whether BKB has violated this Agreement shall be within the sole discretion of the Office. Upon the Office's notifying BKB of any such contradictory statement, BKB may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within forty-eight (48) hours after having been provided notice by the Office. BKB consents to the public release by the Office, in its sole discretion, of any such repudiation. Nothing in this Agreement is meant to affect the obligation of BKB or its officers, directors, agents or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

25. BKB agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in paragraphs 22 and 23 above, or instead to choose to extend the period of deferral of prosecution pursuant to paragraph 21. BKB understands and agrees that the exercise of the Office's discretion under this Agreement is unreviewable by any court. Should the Office determine that BKB has violated this Agreement, the Office shall provide notice to BKB of that determination and provide BKB with an opportunity to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the violation has been cured by BKB.

Basler Kantonalbank
Deferred Prosecution Agreement
Page 8

## Limits of the Agreement

26.     It is understood that this Agreement is binding on the Office but does not bind any other components of the Department, any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities.  However, if requested by BKB or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, this Agreement, the cooperation of BKB, and BKB's compliance with its obligations under this Agreement.

27.     It is understood that BKB contends that it has jurisdictional arguments and defenses that it could raise to support a claim that it is not subject to prosecution for any criminal offense in the courts of the United States. BKB does not prospectively waive these arguments or defenses and it reserves the right to assert any applicable jurisdictional argument or defense in any future prosecution or civil action by the United States except for the purposes of entering into this Agreement, consenting to the filing of the Information, and the civil forfeiture proceeding under the Civil Forfeiture Complaint.  The Office and BKB agree that should BKB be subject to any prosecution per paragraph 22 above, BKB will not have waived such jurisdictional arguments and defenses.

## Public Filing

28.     The Office and BKB agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of Florida.

29.     The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

## Execution in Counterparts

30.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

Basler Kantonalbank
Deferred Prosecution Agreement
Page 9

## Integration Clause

31.    This Agreement sets forth all the terms of the Deferred Prosecution Agreement between BKB and the Office.  This Agreement supersedes all prior understandings or promises between the Office and BKB.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, BKB's attorneys, and a duly authorized representative of BKB.


Dated:  Washington, DC
         August 28 2018


                                          Very truly yours,

                                          RICHARD E. ZUCKERMAN
                                          Principal Deputy Assistant Attorney General
                                          Tax Division

                                          By: _____
                                          Mark F. Daly
                                          Senior Litigation Counsel
                                          Jason H. Poole
                                          Trial Attorney

Accepted and agreed to:

_____
CHRISTIAN SCHÖNIGER
General Counsel, Basler Kantonalbank                    Aug. 28 2018
                                                        Date


_____
KEITH D. KRAKAUR
CHRISTOPHER J. GUNTHER                                  Aug. 28, 2018
Skadden, Arps, Slate, Meagher & Flom LLP               Date
Attorneys for Basler Kantonalbank

# EXHIBIT A

**CERTIFICATE OF CORPORATE RESOLUTION OF THE BOARD OF DIRECTORS OF
BASLER KANTONALBANK**

We, Adrian Bult, Chairman of the Board of Directors of Basler Kantonalbank, a public law entity duly organized and existing under the laws of Switzerland (**BKB**), and Michael Buess, acting corporate secretary of BKB, do hereby certify that the following is a complete and accurate copy of a resolution adopted by the Board of Directors of BKB on August 16, 2018:

1.   That the board of directors of BKB:

   a)   has thoroughly reviewed and understands the Deferred Prosecution Agreement attached hereto, including the Criminal Information, Statement of Facts and Civil Forfeiture Complaint, attached respectively as Exhibits B, C and D to the Deferred Prosecution Agreement;

   b)   has consulted with U.S. and Swiss legal counsel in connection with this matter, including with respect to BKB's rights, possible defenses, the relevant United States Sentencing Guidelines provisions, and the consequences of entering into the Deferred Prosecution Agreement;

   c)   is fully satisfied with its attorneys' representation during all phases of the investigation and the resolution of this matter;

   d)   acknowledges the unanimous approval of the Deferred Prosecution Agreement by BKB's management board and its request that the Board of Directors vote to enter into the Deferred Prosecution Agreement;

   e)   has unanimously voted to enter into the Deferred Prosecution Agreement, including:

      i) consenting to the filing of a one-count criminal information in the United States District Court for the Southern District of Florida, charging BKB with conspiring with others, including U.S. taxpayers, in violation of Title 18, United States Code, Section 371, to (1) defraud the United States and an agency thereof, to wit, the United States Internal Revenue Service, (2) to file false federal income tax returns in violation of Title 26, United States Code,
      Section 7206(1), and (3) to evade federal income taxes in violation of Title 26, United States Code, Section 7201;  ii) waiving indictment on this charge; and  iii) to make payments totaling USD 60,400,000 as follows:

         (1)   to make a payment of restitution in the amount of USD 17,200,000 to the United States Internal Revenue Service, representing the approximate unpaid pecuniary loss to the United States as a result of the conduct described in the Statement of Facts;

         (2)   to forfeit an amount of USD 29,700,000 to the United States Department of the Treasury for fees earned by BKB as a result of the conduct described in the Statement of Facts; and

(3) to pay a penalty in the amount of USD 13,500,000 as directed by the United States Attorney for the Southern District of Florida or the Tax Division of the United States Department of Justice.

2.      That Christian Schöniger, General Counsel of BKB, is hereby authorized (i) to execute the Deferred Prosecution Agreement on behalf of BKB substantially in such form as reviewed by the Board of Directors with such non-material changes he may approve; and (ii) to take, on behalf of BKB, all actions and to approve and execute all forms, terms or provisions of any agreement and other documents as may be necessary or appropriate in order to carry out the foregoing; and

3.      That Keith D. Krakaur, Esq., and Christopher J. Gunther, Esq., Skadden, Arps, Slate, Meagher & Flom LLP, are hereby authorized to sign the Deferred Prosecution Agreement in their capacity as BKB's U.S. counsel and to take all actions and to approve and execute all forms, terms or provisions of any agreement and other documents as may be necessary or advisable in order to carry out the foregoing.

We further certify that the above resolution has not been amended or revoked in any respect and remains in full force and effect.

IN WITNESS WHEREOF, we have executed this Certification this August 17, 2018.

Adrian Bult
Chairman

Michael Buess
Secretary

## L E G A L I Z A T I O N

I, the undersigned notary public of Basle (Switzerland) Dr. Andreas Flückiger, hereby certify that the foregoing signatures have been executed today before me by

**Mr. Adrian Robert Bult**, born on January 19 (nineteen) 1959 (nineteen hundred and fifty-nine), Swiss citizen of Basle, resident of Basle (Switzerland), who furnished proof of identity trough his Swiss identity card,

and

**Mr. Michael Buess**, born on 1st (first) July 1976 (nineteen hundred and seventy-six), Swiss citizen of Basle, resident of Magden (Switzerland), who furnished proof of identity trough his Swiss identity card,

who are entered in the Register of Commerce of the Canton of Basle (Switzerland) with joint agent

signature at two for the

**Basler Kantonalbank**, Public-Sector Entity (Staatsanstalt) established by cantonal legislation of the Canton of Basle (Switzerland) with domicile in Basle (Switzerland),

<u>Mr. Adrian Robert Bult</u> as president of the board of directors (Bankrat) and <u>Mr. Michael Buess</u> as secretary of the board of directors (Bankrat).

Basle (Switzerland) this 17th (seventeenth) day of August 2018 (two thousand and eightteen)



Dr. Andreas Flückiger
Notary Public

Leg. Prot. 2018 No. 585

## APOSTILLE

(Convention de la Haye du 5 octobre 1961)

| | | |
|---|---|---|
| 1. | Country<br>Land | Swiss Confederation, Canton of Basel-City<br>Schweizerische Eidgenossenschaft, Kanton Basel-Stadt |
| | This public document<br>Diese öffentliche Urkunde | |
| 2. | has been signed by<br>ist unterschrieben von | Dr. iur. Andreas Flückiger |
| 3. | acting in the capacity of<br>in seiner Eigenschaft als | Notary Public |
| 4. | bears the stamp/seal of<br>Sie ist versehen mit dem<br>Stempel/Siegel des/der | Flückiger Andreas |

Certified / Bestätigt

| | | | | |
|---|---|---|---|---|
| 5. | at / in | Basel | 6. | the / am | 17.08.2018 |
| 7. | by the<br>durch das | Legalisation Office of the Canton of Basel-City<br>Beglaubigungsbüro des Kantons Basel-Stadt | | |
| 8. | No. / Nr. | 135159 | tax / Taxe | CHF 20.00 |
| 9. | stamp/seal<br>Stempel/Siegel | | 10. | Signature<br>Unterschrift | Nicolas Stucky |



# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18 cr 60228 - Bloom/Valle

18 U.S.C. § 371

UNITED STATES OF AMERICA

v.

**BASLER KANTONALBANK,**

Defendant.

_____/

## INFORMATION

The United States Attorney charges that:

### Introduction

At all times relevant to this Information:

1. Defendant **BASLER KANTONALBANK ("BKB** or the **Bank")** was a public-law institution incorporated by the Parliament of the Basel City Canton. BKB had its headquarters in Basel, Switzerland. From 1997 to 2014, BKB had a private-banking branch that was located in Zurich, Switzerland.

2. BKB provided a variety of banking and other financial services to customers in the Canton of Basel, as well as outside Switzerland, including providing private-banking and asset-management services to U.S. citizens and residents, some of whom lived in the Southern District of Florida. BKB also acted as a custodian of assets that were managed by third-party investment advisors and external asset managers ("EAMs").

3. United States citizens, resident aliens, and legal permanent residents ("U.S. persons") were obligated to report all income earned worldwide, including from foreign bank

accounts, on their tax returns and to pay the taxes due on that income.  U.S. persons were also

obligated to report to the Internal Revenue Service ("IRS"), on Schedule B of a U.S. Individual

Income Tax Return, Form 1040, whether they had a financial interest in, or signature or other

authority over, a financial account in a foreign country in a particular year and to identify the

country where the account was maintained.

4.      In addition, U.S. persons who had a financial interest in, or signature or other

authority over, one or more financial accounts in a foreign country with an aggregate value of

more than $10,000 at any time during a particular year were required to file a Report of Foreign

Bank and Financial Accounts Form TD 90-22.1 (since changed to FinCEN Form 114),

("FBAR") with the Department of the Treasury.

5.      An "undeclared account" was a financial account beneficially owned by a U.S.

person and maintained in a foreign country that the U.S. person had not timely reported to the

United States on a tax return and FBAR.

## COUNT 1
### CONSPIRACY 18 U.S.C. § 371

6.      The factual allegations contained in Paragraphs 1 through 5 of this Information

are realleged and incorporated by reference as if copied verbatim.

7.      From at least 2002 through 2012, in the Southern District of Florida and

elsewhere, the defendant,

**BASLER KANTONALBANK,**

did knowingly and willfully combine, conspire, confederate and agree with certain U.S. persons,

EAMs, and employees of BKB, to defraud the United States with respect to taxes and to commit

2

offenses against the United States, namely, violations of Title 26, United States Code, Sections 7201 and 7206(1).

8.     It was an object of the conspiracy that BKB and its co-conspirators would conceal the offshore assets and income of U.S. persons who maintained financial accounts at BKB from the IRS, evade the U.S. persons' tax obligations, and file false federal tax returns with the IRS.

### Overview of the Conspiracy

9.     From at least 2002 through 2012, BKB assisted certain U.S. persons in concealing their offshore assets and income from U.S. taxing authorities, evading their U.S. tax obligations, and filing false federal tax returns with the IRS.  By 2010, when the Bank's U.S. related business was at its peak, the Bank held a total of approximately 1,144 accounts on behalf of U.S. customers with an aggregate value of approximately $813.2 million.  Many (but not all) of these accounts were undeclared.  BKB provided a number of traditional Swiss banking services that could assist and did assist its U.S. clients in concealing their accounts from the U.S. government, including the use of code names for accounts, prepaid debit cards, and hold-mail services in which the Bank would not send any account documents to the account holders.  In some instances, bankers at BKB and EAMs working with BKB would emphasize to clients and prospective clients that Swiss bank secrecy could conceal their accounts from U.S. taxing authorities.

10.     Employees of the Bank met directly with some U.S. clients, but the clients primarily interacted with BKB through EAMs with whom BKB had a contractual relationship. Among these EAMs was Martin Lack.  In or around 2003, BKB entered into a relationship with Lack, who had recently left Swiss bank UBS AG.  Lack brought to BKB over twenty U.S. clients with undeclared accounts.  With the knowledge and encouragement of the leadership of BKB's

3

Zurich branch, Lack traveled to the United States to meet with U.S. clients with undeclared accounts and, over the years, brought additional U.S. persons seeking undeclared accounts to the Bank to become clients.

11.     In March 2008, the Bank became aware that UBS was considering closing its cross-border business of servicing U.S. domiciled persons.  Soon after, in May 2008, it became public that UBS's U.S. cross-border business was under criminal investigation by U.S. authorities.  The Bank's Zurich branch saw this as a business opportunity and seized it, signing up additional EAMs and offering usual finders' fees to bring in clients leaving UBS.  In some instances, the Bank and the EAMs promoted BKB as a safe haven for those leaving other banks because it lacked a U.S. presence and therefore supposedly would not be subject to a U.S. criminal investigation.  Between July 2008 and March 2009, the Bank opened 398 new accounts for U.S. persons, resulting in approximately $441.6 million in new assets for the Bank.

### Manner and Means of the Conspiracy

12.     Among the manner and means by which BKB and its co-conspirators carried out the conspiracy were the following:

  a.   BKB opened accounts for U.S. persons that the clients did not report to the United States on either Forms 1040, Schedule B, or on FBARs, and for which the U.S. persons did not report or pay taxes on account earnings to the United States.  The materially false Forms 1040 that clients filed were often electronically transmitted to the IRS through the use of interstate wire communications.  Funds were often transferred to or from these accounts by means of wire transfers in foreign commerce.

  b.   BKB entered into contracts with EAMs and allowed these EAMs to manage undeclared accounts for U.S. persons at the Bank.

4

c.  BKB bankers and co-conspirator EAMs assured certain clients that Swiss bank secrecy would conceal their assets and income from being disclosed to U.S. taxing authorities.

d.  BKB provided hold-mail services, under which account statements and other documents associated with the client's account would not be sent to the customer's address, if any, in the United States, which might reveal a connection between the client and the Bank.

e.  BKB provided certain clients with "assumed name" and "numbered" accounts that provided an extra level of concealment. The accountholder's name would not appear on any correspondence, statements, or similar documents.

f.  BKB allowed U.S. persons to maintain accounts at the Bank through nominee corporations or other entities that were established in various tax-haven jurisdictions, including the British Virgin Islands, Liechtenstein, and Panama. Many of these entities were established with the assistance of EAMs and the Bank knew that the accounts were beneficially owned by U.S. persons.

g.  Beginning in 2008, after the criminal investigation of UBS became public, the Bank signed contracts with additional EAMs as part of an effort to attract clients leaving UBS and other Swiss banks.

h.  Beginning in 2008, after the criminal investigation of UBS became public, BKB bankers and its co-conspirator EAMs emphasized the Bank's lack of a U.S. physical presence as supposedly meaning that the Bank could not be subject to a U.S. criminal investigation.

5

**Overt Acts**

13.　　In furtherance of the conspiracy and to effect the illegal objects thereof, BKB and other co-conspirators, committed the following overt acts, among others, in the Southern District of Florida and elsewhere:

a.　In or around 2003, the Bank entered into an agreement with Lack, pursuant to which Lack brought U.S. clients with undeclared accounts to BKB.

b.　On or about December 13, 2004, Lack met in Miami, Florida with two of his clients with accounts at BKB and accepted a total of approximately $160,000 in cash from those clients as deposits into their undeclared accounts at BKB.

c.　On or about September 20, 2005, Lack met in Miami, Florida with three of his clients with accounts at BKB and gave them a total of approximately $45,000 in cash as withdrawals from their respective undeclared accounts at BKB.

d.　In or after March 2008, BKB employees, including the leadership of the Zurich branch, decided to pursue clients leaving UBS as a business opportunity and authorized usual finder's fees and signed up new EAMs in an effort to attract new clients.

e.　On various dates in or after March 2008, BKB opened new undeclared accounts for U.S. persons leaving other Swiss banks, including, for example, an account for a client who was told by UBS his account needed to be closed because of U.S. government action.  In or around 2008, the client, at the advice of UBS, went to BKB and met with a BKB banker, who encouraged him to transfer his account to

6

BKB because it still had Swiss bank secrecy and was "safe" and "independent"

from the United States.  The client agreed and transferred his undeclared account

from UBS to BKB.

All in violation of Title 18, United States Code, Section 371.


BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY


THOMAS P. LANIGAN
ASSISTANT UNITED STATES ATTORNEY


RICHARD E. ZUCKERMAN
PRINCIPAL DEPUTY ASSISTANT ATTORNEY
GENERAL TAX DIVISION


MARK F. DALY
SENIOR LITIGATION COUNSEL
JASON H. POOLE
TRIAL ATTORNEY


7

# EXHIBIT C

Exhibit C to Deferred Prosecution Agreement

## STATEMENT OF FACTS

### I.    BACKGROUND ON THE BANK

Basler Kantonalbank ("BKB" or "the Bank") was founded in 1899 as a public-law institution in Basel, Switzerland. The Bank was incorporated by the Parliament of the Basel City Canton and all of its voting rights are held by the Canton, a sovereign political subdivision of the Swiss Confederation. The Bank has issued non-voting shares to the public, which amount to 14.2% of the Bank's equity. BKB currently employs approximately 800 persons and operates 14 branches in the Canton. BKB has never had branches, subsidiaries, or affiliates outside Switzerland except for a Guernsey-based subsidiary used for issuing structured financial products. As of December 31, 2017, BKB had approximately $26.5 billion in assets under management.

BKB's core business included retail and custodial banking services, mortgage lending, currency and securities trading, and financing businesses in the Canton and surrounding regions. In addition to accounts held by Swiss residents and businesses, BKB provided private banking and asset management services to individuals and entities outside Switzerland, including citizens and residents of the United States. BKB provided these services principally through a private banking group in Zurich that it acquired in 1997 and closed in 2014. BKB also acted as a custodian of assets that were managed by third-party investment advisors and external asset managers ("EAMs"). These assets included assets beneficially owned and controlled by U.S. persons.

### II.    U.S. INCOME TAX AND REPORTING OBLIGATIONS

U.S. citizens, resident aliens, and legal permanent residents ("U.S. persons") are obligated to report all income earned worldwide, including from foreign bank accounts, on their tax returns and to pay the taxes due on that income. Starting in 1976, U.S. persons have been obligated to report to the Internal Revenue Service ("IRS") on the Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether that individual had a financial interest in or signature authority over a financial account in a foreign country in a particular year and to identify the country where the account was maintained.

Since 1970, U.S. persons who have had (i) a financial interest in, or (ii) signatory authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year, have been required to file a Report of Foreign Bank and Financial Accounts, FinCEN Form 114, formerly known as Form TD F 90-22.1, (the "FBAR") with the Department of the Treasury. The FBAR for the applicable year historically was due on June 30th of the following year.

An "undeclared account" is a financial account beneficially owned by an individual subject to U.S. tax obligations and maintained in a foreign country which had not been reported by the individual account owner to the U.S. government on an income tax return and an FBAR.

Exhibit C to Deferred Prosecution Agreement

## III.   BKB'S OFFENSE CONDUCT

### A. Overview

From at least 2002 through 2012, BKB assisted certain U.S. persons in concealing their offshore assets and income from U.S. taxing authorities, evading their U.S. tax obligations, and filing false federal tax returns with the IRS.  In 2002, BKB held a total of approximately 429 accounts on behalf of U.S. taxpayers, including approximately 286 accounts for either retail clients with assets between $50,000 and $100,000 or U.S. customers not living in the United States.  The aggregate value of these 429 accounts was approximately $127.1 million — 0.94 % of BKB's total client assets at the time.  By 2010, when the Bank's U.S. related business was at its peak, the Bank held a total of approximately 1,144 accounts on behalf of U.S. customers with an aggregate value of approximately $813.2 million — 2.30% percent of BKB's total client assets at the time and a more than six-fold increase in the assets for U.S. customers compared to 2002.  These accounts included both declared and undeclared accounts.

Employees of the Bank met directly with some U.S. clients, but the clients primarily interacted with BKB through EAMs with whom BKB had a contractual relationship.  In some instances, the Bank and the EAMs promoted BKB as a safe haven for those leaving other banks because it lacked a U.S. presence and therefore supposedly would not be subject to a U.S. criminal investigation.  In some instances, the Bank and the EAMs also emphasized the benefits of Swiss bank secrecy in concealing accounts from U.S. taxing authorities.

In or around 2003, seeking to expand its private banking operations, BKB entered into a relationship with Martin Lack, who at the time worked for EAM Firm 1 and who later formed his own firm, Lack & Partner Asset Management AG ("Lack & Partner").  Lack had recently left Swiss bank UBS AG and brought to BKB over twenty U.S. clients with undeclared accounts.  Although Lack was not an employee of the Bank, he had a close working and contractual relationship with BKB.  Lack and the Bank split fees for the new clients and BKB provided support and assistance to Lack, including allowing Lack to temporarily work out of a conference room at the Zurich office from mid-November 2003 to early February 2004 and providing account documents to Lack in 2002 and 2003 when he met with clients in the United States.

The Bank's client base of U.S. persons with undeclared accounts grew between 2003 and 2008.  BKB provided a number of traditional Swiss banking services that could assist and did assist its U.S. clients in concealing their accounts from the U.S. government, including the use of code names for accounts, prepaid debit cards, and hold-mail services in which the Bank would not send any account documents to the account holders.

In March 2008, the Bank became aware that UBS was considering closing its business of servicing U.S.-domiciled persons.  Soon after, in May 2008, it became public that UBS's U.S. cross-border business was under criminal investigation by U.S. authorities.  The Bank's Zurich branch saw this as a business opportunity and seized it, signing up additional EAMs and offering usual finders' fees to bring in clients leaving UBS.  Between July 2008 and March 2009, the Bank opened 398 accounts for  U.S. persons, resulting in approximately $441.6 million in new assets for the Bank.  Following the arrest of Renzo Gadola, an associate of Lack's, in Florida in

Exhibit C to Deferred Prosecution Agreement

November 2010, and the later indictment of Lack in the United States, the Bank began exiting the U.S. cross-border business in August 2011.

### B.  Account Openings by U.S. Customers through Martin Lack

The Bank had long offered some private banking services out of Basel.  Seeking to grow its private banking business, in 1997 BKB acquired a private banking group based in Zurich, which operated through 2014.  Until 2012, the Zurich branch was headed by Executive A, who also served as a member of the Bank's Extended Executive Board.  The branch had its own executive board as well, which Executive A headed.  The Bank established a separate line of reporting for Zurich: rather than reporting to BKB's head of private banking, the Zurich branch instead reported directly to the Bank's Chief Executive Officer.

Beginning in 2002 and 2003, BKB further expanded its private banking by establishing a close business relationship with Lack.  Lack had previously worked as a relationship manager and Team Head on the North America desk at UBS.  In 2002, he left UBS and joined EAM Firm 1.  After approaching a different cantonal bank, Lack settled on BKB as a custodial bank for his clients' assets.

Lack met with Manager A, a deputy head in Zurich, at the Bank's Zurich offices and later met with both Manager A and Executive A to discuss bringing his clients to BKB.  Manager A and Executive A were aware that Lack had undeclared U.S. clients and they welcomed the new business.  Based on Lack's meetings with Executive A and Manager A, it was clear that BKB stressed the benefits of Swiss bank secrecy for clients and would help conceal the clients' accounts.

Lack transferred approximately 30 accounts of U.S. clients to BKB, comprising an aggregate $44.3 million in assets.  Most were clients whose accounts he had formerly managed at UBS.  Lack continued his practice, begun at UBS, of traveling to the United States to meet with U.S. clients.  The Bank was aware that Lack made these trips.  Moreover, the Bank encouraged Lack to bring in new clients, and on at least two occasions minutes for meetings of the Zurich office's executive team show that one of the discussed items was the likelihood of Lack being able to bring in new clients from soliciting business during trips to the United States.  These minutes were copied to the CEO of the Bank, who was Executive A's direct supervisor.  Executive A was aware that Lack had new clients signing account opening forms for BKB in the United States, and in some cases, these forms falsely indicated that they had been signed in Zurich.

In late 2003, while Lack was on one of his U.S. trips, EAM Firm 1 terminated Lack's employment.  Lack called Executive A with the news.  Executive A was eager to keep Lack's clients and allowed Lack to operate his asset management business from a BKB conference room for about two and a half months.

In November 2003, Lack incorporated his own firm, Lack & Partner, through which the close relationship between Lack and BKB continued.  Lack continued to bring new clients to BKB.  Between 2002 and 2009, the number of clients Lack had brought to BKB grew to approximately 74 U.S. customer accounts, with assets of $172.5 million.

Manager A served as the primary relationship manager at the Bank for Lack's clients, and clients who came to Zurich to visit the Bank would generally meet with Manager A. A few of Lack's clients also met with Executive A. Banker 1, who formerly worked for Lack at UBS and came to work at BKB, was another day-to-day contact for Lack at BKB. In 2006, Banker 1 left BKB and took a job working directly at Lack & Partner.

After founding Lack & Partner, Lack continued his travel to the United States. Lack sometimes informed Manager A before he went to the United States. He met with clients in numerous locations on these trips, including in the Southern District of Florida and other locations in Florida, as well as in New York, Atlanta, New Orleans, and other cities. In 2002 and 2003, Manager A provided Lack with clients' account statements by email for Lack to show clients in the United States. Lack carried a portable printer so that he could print off the statements to give to clients without having to carry the statements through U.S. Customs. Later, Lack also had access to BKB's online banking system, from which he could download account statements for clients, including when he was in the United States.

Lack also provided cash services to clients in the United States. For example, Lack met Client 1 in New Orleans and received cash that Client 1 wanted deposited into his undeclared BKB account. Lack invited other clients wanting to make withdrawals from their undeclared accounts to meet him in New Orleans. Using the cash from Client 1, Lack provided cash to those clients wanting to make withdrawals. Lack conducted similar cash transactions with clients throughout Florida, including in the Southern District of Florida. For example, one client would often meet Lack in Florida to receive cash when Lack had cash available from another client making a deposit.

When Lack returned to Switzerland, he gave receipts to Manager A for these cash transactions, so that the clients' accounts could be reconciled. Manager A knew that Lack made the cash transactions in the United States, but he or a member of his staff recorded the transactions as if they occurred in Switzerland as normal withdrawals or deposits. Executive A was also aware of these practices. Certain U.S. clients would visit the Bank in Zurich and withdraw cash directly from their undeclared accounts.

## C. BKB Views Clients Leaving Banks under Investigation as an Opportunity

In March 2008, BKB learned that UBS intended to close its U.S. cross-border businesses servicing accounts for U.S.-domiciled persons. By early May 2008, BKB management was aware of the fact that UBS was under criminal investigation by U.S. authorities when UBS publicly disclosed that U.S. and Swiss authorities were investigating its Swiss-based cross-border banking services for U.S. private clients. In July 2008, UBS announced that it was closing its U.S. cross-border business out of non-SEC registered entities.

Certain executives at BKB's private banking branch in Zurich viewed UBS's exit from the U.S. cross-border business as an opportunity. The Bank's Zurich branch actively sought to attract clients leaving UBS and authorized and offered usual finder's fees for EAMs bringing in new clients in an effort to attract business from clients who were leaving UBS. As Bank employees explained in a September 2008 "Targets & Measures Action Plan" for the Zurich branch's 2009 budgeting process: as "competitor banks partially withdraw from U.S. business,"

the Bank should "seize [U.S. customer] market opportunities immediately" as this opportunity was "not leveraged enough." This document was copied to the Bank's Executive Board.

The Bank knew that some clients leaving UBS sought new banks that would allow them to maintain undeclared accounts. For example, one internal email from November 2008 between two bank employees discussing a client wanting to move from UBS to BKB observed that the prospective client "received a letter from UBS stating that they either have to tax their assets held with UBS . . . or that, otherwise, they would have to look for a new bank." The email was clear that the funds to be transferred to the Bank "were never taxed in the U.S.A."

Following UBS's disclosure that it would exit its U.S.-domiciled client business, the Bank signed contracts with several new EAM firms. For example, in June 2008, Executive A and Manager A signed an agreement with an EAM firm established by two former employees of UBS's North America desk ("EAM Firm 2"). BKB sublet separate offices to this firm and provided the firm with infrastructure and meeting rooms at the Bank's Zurich premises. Internal BKB documents often referred to the firm as the "in-house EAM." EAM Firm 2 opened or transferred 61 U.S. customer accounts with a maximum of approximately $26.9 million in total assets to BKB. The Bank terminated the agreement with EAM Firm 2 in March 2012.

Another EAM around this time was Swiss Financial Adviser 1 and his firm. BKB reached an agreement with Swiss Financial Adviser 1 in 2008, and in 2008 and 2009, Swiss Financial Adviser 1 brought 10 U.S. clients, with assets over $73.1 million, to the Bank. These clients came from UBS and from Credit Suisse AG. Swiss Financial Adviser 1 was later indicted in the United States for conspiring with U.S. taxpayers to defraud the United States.

Yet another adviser, EAM Firm 3, brought several U.S. clients to the Bank, including a family living in New York who transferred over $100 million in undeclared assets from a bank in Liechtenstein to BKB.

EAMs with whom the Bank had existing relationships were also a source of new U.S. clients. One was EAM Firm 4, which had entered into a contract with the Bank in September 2007. In the wake of the UBS disclosure, EAM Firm 4 brought 75 new U.S. clients to the Bank, almost all of them former UBS clients, with assets of $69.4 million.

The Bank also obtained new clients through Lack in 2008, and through Renzo Gadola, a former UBS banker who began working closely with Lack. Gadola formed his own firm, RG Investment Partner AG, but Lack and Gadola shared office space in Zurich. In July 2008, the minutes of a Zurich executive board meeting mention that Lack would be hiring a former banker from UBS's North America desk and note that "EAM Lack is considering hiring a new employee [Gadola] (former UBS) with U.S. clients. Assets amounting up to USD 50 million could be deposited with us (against a finder's fee)." Gadola brought at least eleven former UBS clients to the Bank. And Lack & Partner, during its peak year of 2009, managed $118.4 million in assets for 60 U.S. customer accounts at the Bank.

Overall, between July 2008 and March 2009, BKB opened 398 new U.S. customer accounts with total assets of approximately $441.6 million. Most of these clients were referred to BKB by EAMs. But new U.S. clients also came to the Bank and opened undeclared accounts

Exhibit C to Deferred Prosecution Agreement

directly, without going through an EAM.  During this same period, dozens of undeclared accounts, with total assets of nearly $41.4 million, were opened directly at the Bank by U.S. persons.

### D.  BKB's Aiding and Abetting of U.S. Taxpayer-Clients in Evading U.S. Taxes

The Bank offered a variety of traditional Swiss banking services that could aid and did aid its U.S. clients in concealing their assets and income from U.S. authorities.  Primarily, the Bank did so by opening and maintaining accounts for U.S. taxpayers and by allowing third-party EAMs with whom it had contractual relationships to open accounts for U.S. taxpayers at BKB. In some instances, BKB also emphasized, especially after the revelations about UBS being under criminal investigation, that the Bank lacked a physical presence in the United States.

The Bank also offered other services that were used by U.S. taxpayers as means of concealment.  One such feature was the "hold mail" service.  Clients who opted for this service would not have account statements or other documents associated with the account sent to the customer's address, if any, in the United States, which might reveal a connection between the client and the Bank.  Instead, the customer's mail would remain at BKB.  Between 2002 and 2010, BKB maintained approximately 568 U.S. accounts with "hold mail" service.

BKB also provided certain U.S. customers with "assumed name" and "numbered" accounts.  By using such accounts, clients received an extra level of concealment.  The accountholder's name would not appear on any correspondence, statements, or similar documents.

U.S. clients held 226 accounts at the Bank through nominee corporations or other entities that were established in various tax-haven jurisdictions, including the British Virgin Islands, Liechtenstein, and Panama.  Most of these entities were established with the assistance of EAMs and the Bank knew that the accounts were beneficially owned by U.S. persons.  Many of these U.S. clients held undeclared accounts in the name of such entities.

BKB also permitted U.S. customers and EAMs to structure withdrawals from undeclared accounts in amounts less than $10,000 in an attempt to conceal transactions from U.S. authorities.  For example:

- One U.S. client, between March 2009 and January 2012, wrote 100 checks in the amount of $5,000 each, a total of $500,000, all drawn on an account nominally owned by a Liechtenstein foundation.

- Another U.S. client, over a period of three days in January 2009, wrote 21 checks in amounts between $4,800 and $9,900, a total of approximately $200,000.

- Another U.S. client wrote 20 checks of $9,200 each, a total of $183,000, drawn on the client's numbered account between March 2010 and March 2011.

BKB permitted three annuity accounts for insurance carriers (commonly known as insurance wrappers), where the Bank was or is aware that the account had been funded by a U.S.

person and that therefore the insurance carrier likely had an insurance contract with a U.S. client-policy holder.

Finally, in at least 18 cases, the Bank processed substantial cash withdrawals (over $500,000) for U.S. clients in connection with closing accounts. These large withdrawals meant that it would be harder to track the client to another bank where the client might deposit the cash to set up a new undeclared account. For example, the Bank provided two U.S. account holders with an undeclared account with $110 million in cash, which had been transferred to BKB from a Liechtenstein bank in December 2008. In another instance, the Bank processed $5.7 million in cash withdrawals by a U.S. client between March 2007 and May 2012.

### E. Specific Examples of Misconduct

During the course of the Bank's aiding and abetting U.S. taxpayers in evading their U.S. taxes, Bank employees, EAMs, and U.S. clients took a variety of actions to maintain the secrecy of the undeclared accounts. Some representative examples of the Bank's undeclared U.S. clientele and their misconduct include:

- Client 2 had accounts at UBS, including accounts holding approximately 2,900 gold Kruggerands. In December 2008 and January 2009, Client 2 transferred his accounts to BKB. He met with a banker at BKB, Banker 2, who assured him that his account at BKB would be "safe" because the Bank did not have a presence in the United States.

- Client 3 had a UBS account. His banker at UBS was Asset Manager A, at the time a UBS employee. When UBS began closing U.S.-person accounts, and Asset Manager A left the bank to form EAM Firm 2, Client 3 followed and had his account transferred to BKB. Client 3 regularly mailed envelopes of cash into Switzerland to Asset Manager A, in amounts under $10,000 to avoid currency reporting requirements. He would periodically travel to Switzerland to meet with Asset Manager A and employees of the Bank to deposit the accumulated cash mailed into the country. In 2012, Client 3 transferred his account to a bank in Lithuania.

- Client 4 was a UBS client whose account was also managed by Asset Manager A. In 2008, Asset Manager A told him that because of pressure from the U.S. government, he was leaving UBS and forming his own advisory firm and advised Client 4 to transfer his account to BKB. Client 4 agreed and flew to Switzerland to meet with Asset Manager A and Bank employees to transfer his account.

- In or around 2008, Client 5 met with a UBS banker in Zurich about his family's account. The banker told him that UBS had to close accounts for U.S. persons because of U.S. government action and advised him to go to BKB. Client 4 met with Banker 3 at BKB's offices. Banker 3 encouraged him to transfer his account to BKB, because BKB still had Swiss bank secrecy but was "safe" and "independent" from the United States. Client 5 had the account transferred. A Bank employee also advised him to always withdraw less than $10,000 in cash

Exhibit C to Deferred Prosecution Agreement

from the account, which he once did in June 2009, and to use a relative with an account in the Netherlands to funnel deposits and withdrawals to the Swiss account at BKB, which the client never did.

- In or around late 2009, the husband of Client 6 transferred his assets from Bank Julius Baer to BKB and opened an account in the name of Client 6. Client 6's husband and her sister, a German citizen, met with Banker 4 in a conference room at the Bank. Afterwards, Client 6 and her husband did not contact the Bank directly and had the bank retain documents and statements at the Bank. Instead, communications would be made through the German sister of Client 6, who had a Power of Attorney on the account.

- In 2010, Client 7 had an account at Swiss Bank A. Asset Manager B, who ran EAM Firm 5, advised him to transfer his account to BKB because it was not "on the U.S.'s radar." Client 7 transferred his funds and met with Banker 2 to conduct the transfer. The account was held in the name of a nominee corporation established in the British Virgin Islands, but Client 7 and his wife were the beneficial owners of the account, as BKB was aware. EAM Firm 5 provided a Form A stating that both beneficial owners were Israeli citizens and residents.

- In 2008, Client 8 had an account at UBS. His banker at UBS told him he needed to leave and suggested he set up a "black and white" account at another Swiss bank. A "black and white account" meant having a small declared account, which was reported to U.S. authorities, and a larger undeclared account that was kept hidden. After being rejected by several other banks, Client 8 met Swiss Financial Adviser 1, who was able to move his UBS account to BKB. The adviser told him that BKB did not have a U.S. presence and that the U.S. government was focusing on Swiss banks that did. The account at BKB was held in the name of a nominee Hong Kong corporation formed by the adviser.

- Client 9 transferred his accounts from UBS and at another Swiss bank, worth approximately $17 million, to BKB. He met with Banker 2 at the Bank's offices in Zurich, who told him that BKB was still accepting U.S. clients and that it lacked operations in the United States. Client 9 held his account through the use of a nominee offshore corporation. At the time of account opening, Client 9 did not disclose to the Bank that he was a U.S. person.

## F. The Bank's Response Following Various U.S. Justice Department Prosecutions

In February 2009, UBS entered into a deferred prosecution agreement with the United States. Soon after learning of this, BKB's Executive Board adopted a new policy mandating that, beginning in April 2009, no new accounts would be opened for U.S.-domiciled customers or non-U.S. structures with U.S.-domiciled beneficial owners, even if the beneficial owner was prepared to provide a Form W-9 to the Bank. The Bank's policy toward U.S. persons went

Exhibit C to Deferred Prosecution Agreement

through several changes over the next two years, but it was only in late 2011 that the Bank began to fully exit relationships with U.S. domiciled clients.

The Bank started to exit client relationships with U.S.-domiciled persons in 2011. This policy did not apply to U.S. persons living outside the United States, even though such persons remained subject to U.S. taxation. In addition, some individual bankers continued opening some undeclared accounts for U.S. persons, usually by having a non-U.S. person listed as the beneficial owner, even though the Bank was aware the account really belonged to a U.S. person. For example, Lack worked with Manager A to open a new undeclared account for a U.S. client by using a Spanish friend of the client as a nominee. Another client, working directly with a BKB banker, opened an account in the name of a German relative.

In January 2010, the executive team at the Zurich offices requested that the Bank amend its U.S. policy to once again permit the acceptance of new U.S.-domiciled clients and structures with U.S.-domiciled beneficial owners if the clients and beneficial owners provided a Form W-9. BKB management approved this change, provided that the U.S.-domiciled customers and beneficial owners signed a waiver form permitting the Bank to disclose their name to U.S. authorities.

During the course of 2010, BKB opened 56 new accounts for U.S.-domiciled customers with total assets of approximately $75.2 million. The Bank stopped accepting accounts for U.S.-domiciled clients at the end of 2010, when Gadola was arrested in the United States. In November 2010, Gadola was in Miami, attempting to persuade a BKB client managed by Lack to not join the U.S. voluntary disclosure program. The meeting was recorded and Gadola was arrested by law enforcement. He pleaded guilty in December 2010. After Gadola's guilty plea, the Bank instituted a new policy of not accepting U.S. clients even with a Form W-9.

The Bank decided to exit the business of servicing existing accounts for U.S.-domiciled persons on August 16, 2011, two weeks after the Justice Department made public that Lack had been indicted for his involvement with helping U.S. clients open and maintain undeclared accounts at the Bank.

## G. BKB's Inadequate Control of the Zurich Branch

Between 2002 and 2012, BKB's business for U.S. customers was almost exclusively driven by operations in Zurich. This Zurich office was established in 1997 by five bankers who joined the Bank as a group from another Swiss bank. This branch was allowed to operate largely independently of the Bank's head office in Basel, and BKB failed to exert sufficient supervision and control over relationships with EAMs that catered to U.S. customers who wanted to open undeclared accounts at the Bank.

Prior to 2012, BKB did not develop and implement an effective system of controls over relationship managers or EAMs with respect to tax compliance and the prevention and detection of violations of U.S. tax laws, including issuing specific policies regarding the proper handling of accounts beneficially owned by U.S. persons.

Even after the UBS criminal tax investigation became public, before 2010, BKB did not adopt a program to fully address the Bank's obligations with respect to U.S. tax law compliance.

Until 2010, BKB took inadequate steps to educate relationship managers and EAMs about the proper handling of U.S. customers and the conduct that could assist U.S. customers with concealing assets and evading U.S. tax obligations. The Bank focused primarily on compliance with banking and securities regulations, but did not implement policies or directives that were adequate to detect or prevent any violations of U.S. tax law.

## IV. MITIGATING FACTORS AND REMEDIATION

While profitable, BKB's facilitation of tax evasion by U.S. customers was not the Bank's main source of income. BKB's gross fees from its business with U.S. customers between 2002 and 2014 was on average $3,000,000 per year. This amount includes fee income from both retail and private banking customers, from both Swiss-based and U.S.-domiciled U.S. clients, as well as those with declared accounts.

BKB's remediation has been comprehensive. BKB has halted and terminated all U.S. cross-border business with U.S. clients and adopted a general policy to provide its services only to tax-compliant clients. It does not accept new U.S.-domiciled customers and has exited over 1,000 existing U.S.-domiciled customers. BKB required U.S. taxpayer-clients living outside the United States to submit a W-9, to provide a banking secrecy waiver, and to confirm that they comply with their U.S. tax obligations. BKB closed its Zurich branch in 2014 and dismissed the employees and managers implicated in the Department's investigation of the Bank's U.S. cross-border business. Additionally, BKB has generally restricted its cooperation with EAMs, now requires its remaining EAMs to comply with BKB's tax-compliance policies, and has terminated all agreements with EAMs that managed U.S. customers (except for five, who no longer service U.S. customers).

Eventually, BKB began to take measures that were progressively more stringent in an attempt to ensure that U.S. customers complied with U.S. tax laws:

- Upon learning of UBS's deferred prosecution agreement in February 2009, BKB's Executive Board approved a new policy mandating that no new accounts would be opened by U.S.-domiciled customers or structures with U.S.-domiciled beneficial owners, even if the beneficial owner was prepared to provide a Form W-9.

- For a period in 2010, BKB revisited its U.S. policy and decided that certain U.S.-domiciled customers and beneficial owners would be allowed to open accounts, but only if they provided a Form W-9. By December 2010, BKB again decided to stop accepting all new U.S.-domiciled customers and structures with U.S.-domiciled beneficial owners, including those who could evidence full U.S. tax compliance and provide a Form W-9.

- In 2011, BKB began exiting all existing U.S. customer relationships. Exceptions were made for a limited subset of U.S. customers, including those for whom BKB held mortgages and those who were only temporarily domiciled in the United States, provided that they submitted a Form W-9, confirmed U.S. tax compliance, and waived banking secrecy.

BKB has also conducted extensive outreach to former U.S. customers in order to encourage their participation in IRS-sponsored voluntary disclosure programs. BKB has

Exhibit C to Deferred Prosecution Agreement

provided such customers with documentation to support their potential applications to disclosure programs.  As far as the Bank is aware, its encouragement to U.S. customers has been effective, as a significant number of U.S. customers have participated in an announced IRS voluntary disclosure program.

Since 2012, BKB has fully cooperated with the Department's investigation.  BKB has conducted an internal investigation and provided the Department with the broadest scope of requested information permissible under Swiss law.  BKB has performed an extensive document review and production, requiring translation services and manual data mining, and conducted numerous formal interviews of personnel in Zurich and Basel.  BKB has also presented detailed findings and analysis of its investigation during multiple meetings with the Department.

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

UNITED STATES OF AMERICA,

                Plaintiff,

v.

$29,700,000.00 IN UNITED STATES
CURRENCY,

                Defendant *in Rem.*

_____/

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America ("the United States"), through undersigned counsel, hereby files this Verified Complaint ("the Complaint") for Forfeiture *In Rem* against $29,700,000.00 in United States currency, and in support thereof alleges as follows.

## JURISDICTION AND VENUE

1.      This action is brought by the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C), seeking the forfeiture of $29,700,000.00 in United States currency (the "Defendant Currency").

2.      This Court has jurisdiction pursuant to Title 28, United States Code, Section 1355.

3.      Venue is proper pursuant to Title 28, United States Code, Section 1355(b)(1)(A), because certain acts and omissions giving rise to the forfeiture took place in the Southern District of Florida, and pursuant to Title 28, United States Code, Section 1395(c), because the Defendant Currency is located in the Southern District of Florida.

4.     The Defendant Currency represents property constituting and derived from proceeds of wire fraud in violation of Title 18, United States Code, Section 1343, and property traceable to such property, and is therefore subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

## PROBABLE CAUSE FOR FORFEITURE

5.     Basler Kantonalbank ("BKB"), a financial institution headquartered in Switzerland, entered into a Deferred Prosecution Agreement with the United States, wherein, *inter alia,* BKB agreed to forfeit a total of $29,700,000.00 in United States currency, the Defendant Currency, to the United States. BKB agreed that the Defendant Currency is the substitute *res* for the proceeds of BKB's wire fraud offense. The Deferred Prosecution Agreement, with the accompanying Statement of Facts and Information, are attached and incorporated herein by reference, as Composite Exhibit A.

## CLAIM FOR FORFEITURE

6.     The allegations contained in paragraphs one through five of this Complaint are incorporated by reference herein.

7.     Title 18, United States Code, Section 981(a)(1)(C), subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of... any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

8.     "Specified unlawful activity" is defined in Title 18, United States Code, Section 1956(c)(7) to include any offense under Title 18, United States Code, Section 1961(1). Section 1961(1) lists, among others offenses, violations of Title 18, United States Code, Section 1343 (wire fraud).

2

9.     Based on the foregoing, the Defendant Currency is subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C), as it is substitute *res* for property derived from wire fraud, in violation of Title 18, United States Code, Section 1343.

WHEREFORE, Plaintiff United States of America requests that process issue to enforce the forfeiture of the Defendant Currency, and that all persons having an interest in the Defendant Currency be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Currency to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

RICHARD E. ZUCKERMAN
PRINCIPAL DEPUTY ASSISTANT
   ATTORNEY GENERAL
TAX DIVISION

/s/ *Eloisa D. Fernandez*
Eloisa Delgado Fernandez
Assistant United States Attorney
Florida Bar No. 0999768
eloisa.d.fernandez@usdoj.gov
U. S. Attorney's Office
99 N.E. 4th Street, 7th Floor
Miami, Florida 33132
Telephone: (305) 961-9025
Facsimile: (305) 536-4089

/s/ *Mark F. Daly*
Mark F. Daly
Senior Litigation Counsel
Court ID No. A5501435
mark.f.daly@usdoj.gov
Tax Division 01 D Street NW – Room 7334
601 D Street NW – Room 7334
Washington, DC 20004
Telephone: (202) 616-2245
Facsimile: (202) 616-1786

Jason Poole
Trial Attorney
Court ID No. A5501525

3

## **VERIFICATION**

Pursuant to Title 28, United States Code, Section 1746, I declare under penalty of perjury, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and Composite Exhibit A, and state that the facts alleged therein are true and correct to the best of my knowledge and belief.

The sources of deponent's information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

Executed this _____ day of August, 2018.


_____
Scott A. Johnson, Special Agent
United States Internal Revenue Service

4

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. CASE NO. 18-CR-60228-Bloom

UNITED STATES OF AMERICA

v.

BASLER KANTONALBANK

      Defendant.

_____/

## WAIVER OF INDICTMENT

      Basler Kantonalbank, by and through its attorneys, Skadden, Arps, Slate, Meagher &
Flom LLP, under authority granted by its Board of Directors, being advised of the nature of the
charge, the proposed information, and of its rights, hereby in accordance with the provisions of
the Deferred Prosecution Agreement with the United States, waives prosecution by indictment
and consents to the filing of an Information charging it with one count of a violation of Title 18,
United States Code, Section 371, pursuant to paragraph 1 of the Deferred Prosecution
Agreement, dated August __, 2018.

                      BASLER KANTONALBANK
                      DEFENDANT

                      By:_____
                      KEITH D. KRAKAUR
                      CHRISTOPHER J. GUNTHER
                      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                      *Pro Hoc Vice [Motion Pending]*

                      By:_____
                      DANIEL RASHBAUM, ESQ.
                      MARCUS, NEIMAN & RASHBAUM, LLP